**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| Charter Oak Fire Insurance Company, *as subrogee of Midstate Restoration, Inc.*, | File No. 24-CV-2776 (JMB/ECW) |
| Plaintiff, | |
| | **ORDER** |
| v. | |
| The County of Dodge, Minnesota, | |
| Defendant. | |

---

Scott A. Brehm, Kelly R. Rodieck & Associates, St. Paul, MN, for Plaintiff Charter Oak Fire Insurance Company.

Jason J. Kuboushek, Iverson Reuvers, Bloomington, MN; and Carlos B. Soto-Quezada, Kennedy & Graven, Chartered, Minneapolis, MN; for Defendant the County of Dodge, Minnesota.

---

This matter is before the Court on Defendant Dodge County's (the County) Motion for Summary Judgment. (Doc. No. 31.) For the reasons explained below, the Court grants the motion.

**STATEMENT OF UNDISPUTED FACTS**

This case arises from the collapse of Bridge 20504 (the Bridge), a timber bridge in Dodge County, MN. The Bridge collapsed on August 12, 2022, when Charter Oak's insured, Midstate Restoration, Inc. (Midstate), drove a milling machine onto the Bridge.

In the years leading up to the collapse, the Minnesota Department of Transportation (MnDOT) rated the Bridge as "adequate," including in its inspections in 2013, 2015, 2017, 2019, and 2021. (Doc. No. 26-19 at 2.) However, despite this Adequate rating, the

1

Bridge's 2021 inspection report also noted "severe bulging/crushing" on Pile 5 of Pier 2. (Doc. No. 38-13 at 6.)

In August 2022, a project to resurface the Bridge began. (Doc. No. 3 ¶ 8.) Rochester Sand & Gravel was the general contractor and subcontracted with Midstate to remove a layer of asphalt from the surface of the Bridge using a milling machine. (*Id.* ¶ 9; Doc. No. 34-4; Doc. No. 34-5 at 17:22–18:5.)

On August 11, 2022, Midstate milling operator Jonathan Lyon arrived at the Bridge site with a milling machine that weighed 90,000 pounds. (Doc. No. 34-7 at 11:21–24, 14:13–15.) He expressed concern about the Bridge's condition and inspected the underside of the Bridge, and asked Ryan Baker, the on-site County inspector, for the Bridge's load rating. (*Id.* at 12:7–15; 13:13–14:8.) Baker then made a number of phone calls to answer the question. (*Id.* at 14:5–11.) According to Baker, he told Lyon that the Bridge was rated for 80,000 pounds, based on the Bridge Inventory Sheet. (Doc. No. 34-8 at 33:14–34:1–8.) The Rochester Sand & Gravel paving supervisor told Lyon, "Well, we've been running 80,000-pound trucks across this bridge all day." (Doc. No. 34-7 at 15:12–16.) Lyon responded that he did not feel comfortable using the 90,000-pound milling machine on the Bridge. (*Id.*) The parties decided that Midstate would bring a smaller milling machine the next day. (Doc. No. 34-8 at 36:10–24.)

That evening, County engineer Guy Kohlnhofer was asked about the Bridge's conditions, and he sought guidance from MnDOT. (Doc. No. 38-6 at 58:8–19; 59:18–60:7.) However, he did not hear back from MnDOT before milling began the next day. (*Id.* at 58:24–25.) Kohlnhofer did not communicate to Baker or anyone else that he had

not heard from MnDOT.  (*Id.* at 60:8–61:6.)  His expectation was that he was simply "giv[ing] input into what they were doing in the field," but he "was not there to give direction."  (*Id.* at 61:5–6, 14–20).  Kohlnhofer noted that "[t]here was nothing that stood out in the inspections on that timber bridge" (*id.* at 53:10–12), none of the references to "hollow sounding or rotting or decay or cracking" "were uncommon" (*id.* at 53:14–23; *see also* 80:19–82:6 (indications in the 2021 report concerning "decay," "moderate splitting," "crushing," and "exterior collapse," were "[n]ot out of the ordinary for a timber bridge")), and at the time of the incident, the Bridge "was in . . . adequate condition and able to support appropriate weight," including an "80,000-pound semi" (*id.* at 55:4–9).

On August 12, 2022, Midstate returned to the Bridge site with a smaller milling machine operated by Paul Larsen.  (Doc. No. 34-5 at 35:20–36:3.)  Baker was on-site; he used his phone to look up the weight of the smaller milling machine and determined that it was less than 80,000 pounds.  (Doc. No. 38-5 at 42:8–43:19; Doc. No. 34-8 at 42:21–43:11.)  Baker also had a conversation with Larsen about the work that would occur that day and that the bridge deck needed to be milled off.  (Doc. No. 38-5 at 44:15–25.)  Based on his knowledge of the milling machine's weight and the 80,000-pound bridge capacity, Baker believed that it was safe to proceed with the milling work.  (*Id.* at 46:6–13.)  If Baker had had concerns about the weight of the milling machine presenting a safety issue, he would not have allowed the work to go forward.  (*Id.* at 46:14–18.)  Baker could have stopped the milling work, or he could have called a supervisor or the county engineer, but he chose not to because he believed that it was safe to proceed.  (*Id.* at 19–25.)  Larsen began the milling process, got off the machine to check his progress, and then the Bridge

collapsed.  (Doc. No. 34-11 at 17:10–15.)

In July 2024, Charter Oak initiated this action, asserting one count of negligence. (Doc. No. 3 ¶¶ 5–41.)  Charter Oak seeks $499,344.00 for the net replacement cost of the milling machine destroyed in the Bridge collapse, $41,586.77 for the costs incurred to remove and recover the milling machine from the riverbed following the Bridge collapse, and pre-judgment and post-judgment interests, costs, and disbursements.  (*Id.* at 7.)

### DISCUSSION

The County has moved for summary judgment, arguing that the doctrines of common law official immunity and vicarious immunity protect it from liability.  (Doc. No. 23.)[1]  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The substantive law determines which facts are "material" and which are irrelevant: material facts are those whose resolution affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To survive the motion, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  All justifiable inferences are to be drawn in the non-moving party's favor, *Anderson*, 477 U.S. at 255.  Because both of the two identified employees are protected by official immunity, the Court grants the County's motion.

---

[1] The County also moves for summary judgment based on statutory immunity and the public duty doctrine.  In light of the Court's decision to grant summary judgment based on common law official immunity, the Court need not address these alternative arguments.

4

Under Minnesota law, government officials may be immune from liability through the common law doctrine of official immunity. Under this doctrine, a public official charged by law with duties that call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless the public official is guilty of a willful or malicious wrong. *Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014). Official immunity "protects public officials from the fear of personal liability that might deter independent action and impair effective performance of their duties." *Elwood v. Rice Cnty.*, 423 N.W.2d 671, 678 (Minn. 1988). Consistent with this purpose, common law official immunity does not protect officials when they are charged with the execution of ministerial, rather than discretionary, functions, that is, where "independent action" is not required. *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 655 (Minn. 2004). Whether official immunity applies turns on an assessment of the following three factors: (1) the conduct at issue; (2) whether the conduct is discretionary or ministerial and, if ministerial, whether any ministerial duties were violated; and (3) if discretionary, whether the conduct was willful or malicious. *Vassallo*, 842 N.W.2d at 462.

When determining whether conduct is discretionary or ministerial, courts focus on "the nature of the act." *Mumm v. Mornson*, 708 N.W.2d 475, 490 (Minn. 2006) (quotation omitted). A discretionary duty involves "individual professional judgment that necessarily reflects the professional goal and factors of a situation." *Id.* at 490–91 (quotation omitted). By contrast, a ministerial duty is one that is "absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts," *Anderson*, 678 N.W.2d at 656 (quotation omitted), and "[a] ministerial act is either the implementation

or exercise of established public policy, or the application of specific written guidelines," *S.W. v. Spring Lake Park Sch. Dist. No. 16*, 592 N.W.2d 870, 876 (Minn. Ct. App. 1999) (citation omitted); *compare MFK by Kendrick v. Walker-Hackensack-Akeley ISD #113*, 11 N.W.3d 618, 624 (Minn. Ct. App. 2024) (concluding that a softball coach's manner of supervision of practice was discretionary because she could exercise significant independent judgment over how she supervised the practice, as well as "deciding where to locate practice stations and how many to set up, how many players to have at each station based on their age and ability, and where to locate the coaches so they could provide sufficient supervision for the softball practice") *with Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 314, 316 (Minn. 1998) (concluding that a sidewalk inspector had no discretion to forego immediate repair of a broken sidewalk slab where the pertinent statute mandated sidewalk inspectors to "immediately repair" broken sidewalk slabs).

In this case, the parties identify only two specific officials: Baker and Kolnhofer. The parties agree on the relevant facts concerning the decisions and actions of each official, but they disagree on whether those decisions and actions are, as a matter of law, discretionary or ministerial. The Court addresses each official in turn, concluding that both are protected by official immunity because their conduct was discretionary rather than ministerial.

The Court first concludes that Baker exercised discretion when he responded to Lyon and Larsen on August 11 and 12, 2022, and when he determined that milling could proceed on August 12, 2022. Baker acknowledges that he could have stopped the milling work from proceeding and he could have called a supervisor or the county engineer, but he

6

chose not to do so because he determined that it was safe for milling to proceed. (Doc. No. 38-5 at 46:14–25.) Absent evidence in the record concerning what specific information an inspector must obtain and what specific actions an inspector must take according to established policy or written guideline, the Court concludes that Baker necessarily used his independent judgment and discretion when deciding whether to further inspect the Bridge himself and whether to stop the milling work from proceeding.

First, the record shows that Baker's duties as inspector include "[n]otifying the Contractor of non-conforming Work," "[r]ejecting non-conforming Material," and "[s]uspending portions of the Work for . . . [s]afety." (Doc. No. 26-16 at 2.) Importantly, these duties do not specify how the inspector must carry out these responsibilities or how an inspector decides what specific work is nonconforming and, therefore, must be prohibited. Second, contrary to Charter Oak's argument that Baker should have independently inquired into the Bridge's actual structural condition (Doc. No. 37 at 33), the record includes no fixed rules or policies that would have required Baker to independently determine the structural condition of the Bridge, to call a supervisor or the county engineer, or to obtain any additional information. MnDOT rated the Bridge as "adequate" in its inspections in 2013, 2015, 2017, 2019, and 2021. (Doc. No. 26-19 at 2.) Charter Oak points to no record evidence requiring Baker to take any specific action to verify MnDoT's rating. Third, nothing in the record indicates that Baker was required to prevent milling work from occurring based on the information that he actually learned about the work activity and the condition of the Bridge. Baker learned that the Bridge was rated for 80,000 pounds based on the Bridge Inventory Sheet (Doc. No. 34-8 at 33:14–

34:1–8), that 80,000-pound trucks had been driving across the bridge "all day" on August 11, 2022 (Doc. No. 34-7 at 15:12–16), and that the milling machine brought to the project cite on August 12, 2022, weighed less than 80,000 pounds (Doc. No. 38-5 at 42:8–43:19; Doc. No. 34-8 at 42:21–43:11).  Charter Oak directs the Court to no established policy or written guideline that dictates how much weight Baker must give to these facts, that makes taking any specific act an absolute, certain, or imperative requirement, or that otherwise confers a ministerial duty onto Baker to conduct his work in a specific way.  *See Anderson*, 678 N.W.2d at 656; *S.W.*, 592 N.W.2d at 876.  For each of these reasons, Baker's actions were discretionary and protected by official immunity.

The Court reaches the same conclusion regarding Kohlnhofer.  Kohlnhofer said in his deposition that he had not looked at the Bridge before its collapse, and that he had not assessed the Bridge's condition himself.  (Doc. No. 34-9 at 39:14–40:3.)[2]  He saw that the Bridge's 2021 report indicated "decay," "moderate splitting," "crushing," and "exterior collapse," but these statements did not cause him any concern about the structure of the

---

[2] Charter Oak directs the Court's attention to the MnDOT Bridge Inspection Field Manual, which provides that a timber pile with "severe crushing" should be rated "CS-4 (Severe)" and which requires further structural review and repairs.  (Doc. No. 38-1 at 15.)  These provisions of the Field Manual, however, did not mandate Kohlnhofer to act in a specific way because the 2021 Bridge inspection report here noted "severe bulging/crushing."  It is important to note that the terms "bulging" and "crushing" are not synonymous, but have specific meanings, and the Field Manual does not require a CS-4 rating for "severe bulging" or for unqualified "crushing."  Moreover, even if the 2021 Bridge inspection report was incorrect, Charter Oak points to no rule or policy that obligated Kohlnhofer to determine the accuracy of the details or observations contained in the report or to clarify potentially ambiguous terms.  Finally, there is no evidence in the record that Kohlnhofer believed the Bridge had any instances of "severe crushing."  Thus, the Court declines to interpret the Field Manual as conferring any ministerial duties on Kohlnhofer.

Bridge, and that they were not uncommon or "out of the ordinary for a timber bridge." (*Id.* at 53:14–23; *see also* 80:19–82:6.)  Again, contrary to Charter Oak's argument, the record does not include evidence that Kohlnhofer had a ministerial requirement to independently inspect the Bridge or to otherwise take any specific act.  Instead, Kohlnhofer exercised professional judgment to decide whether to independently inspect the Bridge or clarify the characterization of the Bridge in the inspection report.  Kohlnhofer has discretion to decide whether to request a load rating or to assess a bridge in person with a maintenance supervisor.  (Doc. No. 38-6 at 37:15–40:23.)  Here, he determined that it was not necessary to do so.  (*See id.* at 39:22–40:3.)  Absent some evidence that Kohlnhofer was required to personally assess the Bridge or that prohibited him from relying on the information and conclusions in the report, the Court is compelled to conclude that Kohlnhofer's actions were discretionary and protected by sovereign immunity.

### C.    Dodge County

Generally, if a public official is found to be immune from suit on a particular issue, their government employer will be vicariously immune from a suit arising from the employee's conduct, and claims against the employer are dismissed without explanation. *Anderson*, 678 N.W.2d at 663–64.  "This standard grants vicarious official immunity in situations where officials' performance would be hindered as a result of the officials second-guessing themselves when making decisions, in anticipation that their government employer would also sustain liability as a result of their actions." *Anderson*, 678 N.W.2d at 664.

Because the Court concludes that Baker and Kohlnhofer are immune, the Court

necessarily concludes that the County is vicariously immune.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT

IS HEREBY ORDERED THAT:

1.  Defendant County of Dodge, Minnesota's Motion for Summary Judgment
    (Doc. No. 31) is GRANTED.

2.  Plaintiff Charter Oak Fire Insurance Company's Complaint is DISMISSED
    WITH PREJUDICE.

    **LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  August 7, 2026                          */s/ Jeffrey M. Bryan*
                                                Judge Jeffrey M. Bryan
                                                United States District Court